## In re Mark Ervin McGILLIS and Donna Mae McGillis, Debtors.

### No. HG 06 02982.

United States Bankruptcy Court, W.D. Michigan.

May 15, 2007.

---

Rebecca L. Johnson, Esq., Grand Rapids, for Debtors.

Carol S. Chase, Esq., Kalamazoo, for the Chapter 13 Trustee.

Donald W. Bays, Esq., Marquette, for the Debtor.

A. Brooks Darling, Esq., Traverse City, for Colleen Olson, Chapter 7 Trustee.

## OPINION RE: CHAPTER 13 TRUSTEE'S SECTIONS 1325(a)(3), 1325(b), AND MEANS TEST CALCULATION OBJECTIONS

JEFFREY R. HUGHES, Bankruptcy Judge.

Mark and Donna McGillis ("Debtors") have requested the court to confirm their plan over the Chapter 13 Trustee's objection. The Chapter 13 Trustee objects because Debtors allegedly are not committing to their unsecured creditors all of their disposable income as required by Section 1325(b) of the Bankruptcy Code.[1] The Chapter 13 Trustee also asserts that Debtors' plan is not proposed in good faith.[2]

Debtors filed their petition for relief on June 28, 2006, which is after the effective date of BAPCPA.[3] Debtors' plan proposes to distribute an estimated $8,430.00 to all of their unsecured, non-priority creditors.[4] Debtors' arrived at this figure by multiplying what they have calculated to be their disposable income under Section 1325(b)(2) by the required "applicable commitment period" under Section 1325(b)(4).

The Chapter 13 Trustee contends that Debtors' plan is objectionable under Section 1325(b) because it proposes payments into the plan of only $140.00 per month when Debtors can in fact afford to pay more. She argues that the Section 1325(b) distribution Debtors have calculated is not accurate because it is based both upon an understatement of their monthly income and upon an overstatement of their monthly expenses. She also contends that their plan does not comply with Section 1325(b) because it contemplates making all of the required distributions within 37 months, which is well short of the 60 month applicable commitment period imposed by Section 1325(b)(4).

---

1. The Bankruptcy Code is contained in 11 U.S.C. § 101, *et seq.* Unless otherwise noted, all further statutory references are to the Bankruptcy Code.

2. The Chapter 13 Trustee also objected to the language Debtors have in their plan concerning the effect of future administrative expenses and other priority claims upon the amount to be paid to unsecured, non-priority creditors. I sustained that objection in a separate bench opinion given on February 16, 2007. The objectionable language, though, can be corrected through a simple plan amendment.

3. The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, § 1501(B)(1), 119 Stat. 23.

4. Debtors' proposed distribution to unsecured, non-priority creditors is an approximation because it will be paid only after all administrative expenses and other priority claims are paid in full. The $8,430.00 estimate is based upon Debtors' current calculation of the administrative expenses and other priority claims that will be allowed. However, the actual distribution may be less if additional administrative expenses such as Debtors' attorney fees are later incurred.

The Chapter 13 Trustee further argues that Debtors' plan does not meet the good faith standard of Section 1325(a)(3). As with her Section 1325(b) objection, this objection focuses on the discrepancy between what Debtors propose to pay their unsecured, non-priority creditors over 37 months and what Debtors apparently can afford to pay over 60 months.

## DISCUSSION

### I. Section 1325(b) Objection.

#### A. Projected Disposable Income.

Calculating a debtor's "projected disposable income" for purposes of Chapter 13 plan confirmation pre-dates BAPCPA. It was first introduced into the process in 1984 when Congress added Section 1325(b). Subsection (1) of that addition provided that a Chapter 13 plan could not be confirmed over a trustee's or unsecured claimant's objection unless—

> (A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
> (B) the plan provides that all of the debtor's **projected disposable income** to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

11 U.S.C. § 1325(b)(1) (pre-BAPCPA) (emphasis added).

Section 1325(b)(2) then defined disposable income to mean "income which is received by the debtor and which is not reasonably necessary to be expended . . . for the maintenance or support of the debtor or a dependent of a debtor . . .". 11 U.S.C. § 1325(b)(2) (pre-BAPCPA).

Courts typically looked to the debtor's Schedules I and J[5] whenever a pre-BAPCPA Section 1325(b) objection was made.

Prior to the passage of BAPCPA, in order to arrive at a disposable income figure for any Chapter 13 debtor, one would subtract monthly expenses reported on Schedule J from monthly income reported on Schedule I. The court had discretion regarding whether the listed expenses were reasonably necessary for the support of the debtor and any dependents.

*In re Alexander*, 344 B.R. 742, 746 (Bankr. E.D.N.C.2006). *See also, In re Davis*, 348 B.R. 449, 452–53 (Bankr.E.D.Mich.2006).

However, BAPCPA significantly changed Section 1325(b). First, the income component of the disposable income calculation is now to be based upon the debtor's "current monthly income," which is itself a defined term.

> (10A) The term "current monthly income"—
>
> (A) means the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6–month period ending on—
>
> \*     \*     \*     \*     \*     \*

11 U.S.C. § 101(10A).

Second, the expense component of the calculation is subject to further restriction under certain circumstances. In many instances, the expenses that the debtor may subtract from his current monthly income to arrive at his disposable income for purposes of Section 1325(b) are the same as those he could subtract pre-BAPCPA (*i.e.,*

**5.** A debtor must file a statement concerning his financial affairs together with accompanying schedules at the outset of his bankruptcy case. 11 U.S.C. § 521(a)(1). Schedules I and J set forth the debtor's current income and current expenses.

all "amounts reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor."). However, if the debtor's current monthly income exceeds a specified amount, then the expenses a debtor may subtract is further restricted by the requirement that they "be determined in accordance with subparagraphs (A) and (B) of Section 707(b)(2)." 11 U.S.C. § 1325(b)(3). Subparagraphs (A) and (B) of Section 707(b)(2), of course, comprise a significant portion of the so-called "means test" now used in conjunction with determining whether a debtor's Chapter 7 case should be dismissed for abuse.

Third, the time frame within which the debtor's disposable income is to be measured has been changed from a static three years to an "applicable commitment period" that varies depending upon the debtor's income. If the debtor's current monthly income places him below the standard set in Section 1325(b)(4), then the applicable commitment period remains at three years. However, if the debtor's current monthly income is equal to or greater than the standard, then the applicable commitment period is five years. 11 U.S.C. § 1325(b)(4)(A)(ii).[6]

Finally, the focus of the Section 1325(b) objection is no longer upon the total payments the debtor will make under the plan but rather upon the total payments the debtor will make to unsecured creditors under the plan. Consequently, if payments on account of secured debt were not included in the pre-BAPCPA Section 1325(b) arithmetic, they clearly are now.

The parties agree that Debtors' current monthly income is greater than the median family income for a similar Michigan household. Therefore, calculation of Debtors' disposable income requires consideration of the Section 707(b)(2)(A) and (B) criteria and the "applicable commitment period" in this instance is five years. 11 U.S.C. §§ 1325(b)(3) and (4). Moreover, the parties agree that Debtors have properly completed their Form B22C.[7] That form indicates that Debtors' current monthly income as defined in Section 101(10A), less Debtors' maintenance and support expenses as calculated pursuant to Sections 707(b)(2)(A) and (B), leaves "disposable income" for Debtors of only $140.00 per month.[8]

Debtors' proposed plan distribution to unsecured creditors of $8,430.00 reflects this figure, for it is slightly in excess of $140.00 times their applicable commitment period of 60 months. Debtors therefore contend that they have complied with Section 1325(b)(1)(B) as now amended. However, the Chapter 13 Trustee argues that Section 1325(b)(1)(B) still leaves room for consideration of Debtors' current financial circumstances as manifested in their Schedules I and J. Those schedules indicate that Debtors at present could afford to pay into their plan a much larger amount per month.

---

**6.** The "applicable commitment period" is actually three or five years only if the distribution to unsecured creditors under the plan is less than 100%. The applicable commitment period may be for a shorter period of time if the plan provides for payment in full. 11 U.S.C. § 1325(b)(4)(B).

**7.** Interim Federal Rule of Bankruptcy Procedure 1007(b)(6) requires a Chapter 13 debtor to file a statement of his current monthly income, and, if necessary, a calculation of his disposable income in accordance with Sections 1325(b)(2) and (b)(3). Form B22C is the official form designated for the submission of these calculations.

**8.** Section 1325(b)(2) also permits the subtraction of charitable contributions and business-related expenses. However, Debtors have not claimed any such deductions.

### 1. Calculation Of The Income Component For Section 1325(b).

Neither Debtors nor the Chapter 13 Trustee have given much attention to the income component of the disposable income calculation. They have instead focused on what deductions may be taken from this amount to arrive at the disposable income figure. Nonetheless, it is fair to say that Debtors favor a strict interpretation of what constitutes current monthly income for purposes of Section 1325(b) whereas the Chapter 13 Trustee advocates an interpretation that allows for consideration as well of whatever Debtors currently are reporting as income in their Schedule I.

The courts that have addressed this specific issue are split. *In re Hanks*, 362 B.R. 494 (Bankr.D.Utah 2007) exemplifies those cases where courts have used the average of the debtor's income over the prior six months (*i.e.*, the debtor's "current monthly income" as defined in Section 101(10A)) for purposes of calculating the debtor's disposable income regardless of how much that average might differ from the debtor's current earnings. *See also, In re Alexander*, 344 B.R. 742 (Bankr.E.D.N.C.2006); *In re Guzman*, 345 B.R. 640 (Bankr.E.D.Wis. 2006). However, there are other courts that have held that if the debtor's current income as set forth in his Schedule I is different from his historical average, then either his Schedule I income overrides that average for purposes of the Section 1325(b) calculation or it must at least be taken into consideration. *In re Kibbe*, 342 B.R. 411 (Bankr.D.N.H.2006) illustrates this alternative interpretation. *See also, In re Hardacre*, 338 B.R. 718 (Bankr.

N.D.Tex.2006); *In re Edmunds*, 350 B.R. 636 (Bankr.D.S.C.2006).

After considering these cases as well as others,[9] I conclude that *Hanks, Alexander* and *Guzman* are the better reasoned decisions. Therefore, only that which has been accurately set forth as the debtor's current monthly income in line 14 of the debtor's Form B22C is relevant for purposes of determining the income component of the Section 1325(b) disposable income calculation. In this instance, Debtors have set $10,225.00 in their Form B22C as this amount.

*Hanks* is especially compelling because it involved a circumstance where it was to the trustee's advantage as opposed to debtor's advantage to advocate a narrow interpretation of Section 1325(b). The Chapter 13 Trustee complains in the case at hand that Debtors will receive an unintended boon if they are able to use their historical average income for purposes of Section 1325(b) instead of the larger amount set forth as current earnings in their Schedule I. However, *Hanks* involved a situation where the debtors had been receiving relatively generous severance payments for some time but where those payments had ceased immediately prior to the commencement of their case. Consequently, the debtors found themselves in the position where they could not afford to pay what would be required under Section 1325(b) if their historical average income was used for that calculation. Nonetheless, the court denied confirmation of their plan because it concluded that Sections 1325(b) and 101(10A) permitted no other interpretation.[10]

---

9. At this point in time, there are over 30 published opinions concerning the interpretation of Section 1325(b) as now amended.

10. Section 1325(b) applies only if the Chapter 13 trustee or another eligible party actually

objects to confirmation of the debtor's plan. Consequently, it is fair to ask why the Chapter 13 trustee in *Hanks* elected to file a Section 1325(b) objection to the debtors' plan under such circumstances. An alternative would

Judge Boulden very ably explained in *Hanks* why Section 1325(b) does not permit courts to tinker with an enactment that Congress clearly intended to be applied without such intervention. No purpose, then, is served by repeating Judge Boulden's reasoning here. Suffice it to say that I, like Judge Boulden, am not persuaded that "projected" and "to be received" as used in Section 1325(b)(1)(B) can be interpreted as a license from Congress for courts to include a debtor's current circumstances and future prospects for purposes of evaluating a Section 1325(b) objection when Congress has otherwise manifested within Section 1325(b) a clear intention to replace such a subjective system with a more objective one. Perhaps, in hindsight, Congress should have removed "projected" from Section 1325(b)(1)(B) as part of the recent amendments. However, its continued presence does not render nonsensical the literal interpretation given to Section 1325(b) by *Hanks* and other similar decisions. On the other hand, if one accepts the expansive meaning *Kibbe* and like-minded courts have given to "projected disposable income" under BAPCPA, then one must also ask why Congress bothered to then define disposable income as it did. As the court in *Alexander* observed, "[i]f 'disposable income' is not linked to 'projected disposable income,' then it is just a floating definition with no apparent purpose". 344 B.R. at 749.

It is certainly regrettable that a literal interpretation of Section 1325(b) as now written may in some instances unfairly benefit the debtor by permitting him to contribute less than he can actually afford. However, it is a rare occasion when a

legislature's effort to establish specific guidelines is so refined that its application is guaranteed to be uniformly fair. It is inevitable that some nuance will have been overlooked. Nonetheless, the courts are bound to enforce what the legislature has enacted.

Ultimately, it is not in this Court's power nor is it this Court's role to change Congress' intentional policy choices or to save it from its inadvertent drafting errors. The language of the statute is plain, and the conflicting policies at work in the Bankruptcy Code as amended by the BAPCPA do not provide a useful guide for interpreting the phrase "projected disposable income" in § 1325(b)(1)(B) in a different manner. Although the Court certainly appreciates the logic and desire of returning to a chapter 13 practice that more closely resembles pre-BAPCPA practice, a harsh or even illogical result is not the same thing as an absurd result, and this Court must therefore interpret the statute according to its own terms.

*Hanks*, 362 B.R. at 502 (footnote omitted).

#### 2. Calculation Of The Expense Component For Section 1325(b).

As already noted, Debtors and the Chapter 13 Trustee agree that the expense component of the Section 1325(b) calculation must take into consideration Sections 707(b)(2)(A) and (B) because Debtors are "above-median-income" debtors within the meaning of Section 1325(b)(3). However, there is then disagreement as to the extent to which the figures established under those subsections apply. Debtors insist that the literal approach used to determine

have been to allow the debtors' plan to be confirmed based upon their current financial circumstances with either (1) a negotiated commitment by the debtors to increase their plan payments if their future income increased due to new employment or (2) the Chapter 13 trustee's own commitment to file a plan amendment to increase payments in the event the debtors' circumstances later improved.

the income component of a debtor's disposable income is also appropriate for purposes of applying the Section 707(b)(2)(A) and (B) allowances to the expense component under Section 1325(b)(3).

That Debtors take this position comes as no surprise given the significant impact such an approach can have upon what Section 1325(b) would require debtors to pay under a confirmable plan. In this instance, Debtors' current monthly income as set forth in their Form B22C ($10,255.00), when adjusted for taxes ($2,942.00), deductions for retirement loans ($1,213.00), and the debt service on their first mortgage and their two car loans ($1,880.00), leaves Debtors with disposable income before other living expenses in the amount of $4,220.00. Therefore, it appears that Debtors' disposable income for purposes of Section 1325(b) would be considerably larger than even what Debtors' Schedules I and J would suggest were it not for the fact that Section 1325(b)(3) requires the court to also take into consideration Section 707(b)(2)(A) and (B) in determining the expense component of the Section 1325(b) disposable income calculation. Incredibly, that consideration, at least according to Debtors, permits a further deduction of $4,050.00 for living expenses instead of the $2,683.00 in other living expenses set forth in Debtors' Schedule J. As a consequence, Debtors maintain that the disposable income figure for purposes of evaluating Trustee's Section 1325(b) objection is $140.00, as opposed to the $1,537.00 that would be used

were Debtors permitted to deduct only the $2,683.00 they had listed as expenses in their Schedule J.

The difference between these two figures can be explained in part because Debtors' actual expenses as set forth in their Schedule J are less than the standard allowances permitted under Sections 707(b)(2)(A). The Section 707(b)(2) calculation also includes a deduction of $202.00 for Chapter 13 administrative expenses not included in Debtors' Schedule J. However, over one-half of the difference between the expense figure Debtors advocate and their Schedule J expenses ($839.00) is attributable to monthly payments on two debts that Debtors do not intend to pay either inside or outside of their Chapter 13 plan. One of these payments ($214.00) is for a Florida timeshare that Debtors are surrendering and the other payment ($625.00) is for a second mortgage loan on their home that will not be made because Debtors intend to avoid the mortgage as part of their plan.[11]

The Chapter 13 Trustee's objection is directed at the propriety of allowing these two deductions. The Chapter 13 Trustee argues that there is simply no room in the Section 1325(b) calculation for the deduction of loan payments that Debtors do not intend to make. Most courts agree. *See, e.g., In re Edmunds,* 350 B.R. 636 (Bankr. D.S.C.2006); *In re Renicker,* 342 B.R. 304 (Bankr.W.D.Mo.2006); *In re McPherson,* 350 B.R. 38 (Bankr.W.D.Va.2006); *In re*

---

**11.** Debtors claimed these payments as deductions in preparing their Form B22C because Section 707(b)(2)(A)(iii)(I) permits a debtor to include in his calculation of average monthly payments on account of secured debts:

"[t]he total of all amounts scheduled as contractually due to secured creditors in each of the 60 months following the date of the petition."

Although Debtors do not intend to continue making payments on either the timeshare or the second mortgage, they nonetheless contend that they remain technically obligated with respect to both until their discharge is entered at the end of their plan. Therefore, Debtors reason that all payments owing on these two obligations during the 60–month period are still "contractually due."

*Crittendon,* 2006 WL 2547102 (Bankr. M.D.N.C.2006).[12]

In *McPherson,* the debtors' plan proposed to "strip down" a lien held by Best Buy Co., Inc.[13] Nonetheless, the debtors contended that they should be allowed to deduct what they had been paying to Best Buy under their contract for purposes of evaluating the Chapter 13 trustee's Section 1325(b) objection. By debtors' calculation, they were entitled to a deduction on account of this secured debt of $67.60 per month. However, the Chapter 13 trustee contended that the monthly deduction should only be the $1.82 that the debtors would actually be paying Best Buy under their plan once Best Buy's lien was "stripped down."

The debtors in *McPherson* never asserted that the $67.60 deduction they were claiming was actually a necessary expense for their maintenance or support. Indeed, it is fair to infer that the debtors would have been resigned to using the $1.82 figure advocated by the Chapter 13 trustee had the debtors' income not been in excess of the Section 1325(b)(3) standard. However, the debtors seized upon their status as above-median-income debtors to argue that the court had no choice but to permit them the larger deduction contemplated under Section 707(b)(2)(A).

*McPherson,* in rejecting this argument, focused upon the phrases "reasonably necessary ... for support" and "to be expended." With respect to the former, it said:

> The phrase "reasonably necessary ... for support" indicates that the amounts, and the payment of the amounts, must be reasonably necessary for the support of the debtor and any dependent. Payments that a debtor does not propose to make during the pendency of the plan and that a debtor is not required to make under the plan cannot be said to be reasonably necessary for the support of that debtor. Thus any deductions from income based on the "amounts" in question must be payments that will be made pursuant to the confirmed plan of reorganization.

*McPherson,* 350 B.R. at 44–45 (footnote omitted).

As for the latter:

> "[T]o be expended", also indicates that the amounts to be deducted are amounts that will be paid in the future. To "expend" means to "put out or lay out". Am. Heritage Dictionary, 462 (1976). To expend amounts of money, then, means to pay out money. Money that is "to be expended" is money that is to be paid in the future. An amount, the payment of which is never contemplated, cannot be

---

**12.** *But see, In re Oliver,* 2006 WL 2086691 (Bankr.D.Or.2006) (court holding that above-median-income debtor could deduct loan payment on second car even though debtors intended to surrender it) and *In re Farrar–Johnson,* 353 B.R. 224 (Bankr.N.D.Ill.2006) (court holding that debtors could deduct IRS Housing Local Standard allowance of $1,227.00 even though debtors lived in military housing for which they paid no rent or mortgage installments).

**13.** "Stripping down liens" is bankruptcy parlance for the practice of reducing the secured

portion of a creditor's claim against the debtor by valuing the collateral securing the claim and then proposing to repay as secured only the amount equal to that value. The excess amount is in turn treated as an unsecured, non-priority claim and, as a consequence, is often repaid at only a fraction of its allowed amount. Although BAPCPA has limited the opportunities when a debtor may take advantage of this tool, it apparently was an option for the debtors in *McPherson* with respect to Best Buy's secured claim.

an amount that is to be paid in the future.

*McPherson,* 350 B.R. at 45.

*McPherson* then went on to explain why the phrase "contractually due" as used in Section 707(b)(2)(A)(iii) must mean only those payments to be paid secured creditors under a plan when that phrase is used in the context of a Section 1325(b) objection. *Id.* at 46–47. However, *McPherson* did not have to take that additional step, for, as that court itself had recognized, it is the "reasonably necessary . . . for support" and the "to be expended" language of Section 1325(b) that ultimately dictates what are to be the expenses that may be used for purposes of determining disposable income under that section.

Courts have no choice now but to use the debtor's average historical earnings to calculate the income component of Section 1325(b) disposable income because that is how BAPCPA defines "current monthly income." However, Congress elected not to impose a similar definitional constraint upon the calculation of the expense component. Rather, it simply left the deduction of all expenses, whether they be for maintenance and support, charity, or business, to "those amounts reasonably necessary to be expended." 11 U.S.C. § 1325(b)(2). Likewise, Congress did not replace this phrase with a mandate to the effect that support and maintenance expenses "shall mean those amounts determined under Sections 707(b)(2)(A)(i)—(iii) and (B)" or something similar when the debtor's currently monthly income exceeds the Section 1325(b)(3) limit. Instead, Congress repeated in Section 1325(b)(3) the very same phrase that it had already used to describe permissible deductions in Section 1325(b)(2): that is, only those deductions that are "reasonable necessary to be ex-

pended." Indeed, this is the same phrase that was used to describe permissible support and maintenance expenses prior to BAPCPA. However, the 2005 amendments did elaborate upon this familiar concept by imposing yet another limitation, that being that the deductions claimed by the above-median-income debtor as reasonably necessary must also "be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2) . . .". 11 U.S.C. § 1325(b)(3).

*Farrar–Johnson,* · in interpreting this additional limitation, perfunctorily concluded that "[t]hat section states plainly that disposable income 'shall' be determined under section 707(b)(2) using the IRS standards," 353 B.R. at 228, without giving any consideration whatsoever to the equally important phrase "in accordance with." "In accordance," though, simply means in agreement or in conformance.[14] Indeed, Congress used the same phrase in BAPCPA to amend immediately preceding Section 1325(b)(2) when it excepted from current monthly income support payments received for a dependent child "made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for each child . . .". It is unlikely that anyone would suggest that "in accordance" as used in that subsection means that the applicable bankruptcy laws ordering the support are to override the bankruptcy court's independent consideration of whether the expenditure of the same is required. Otherwise, the additional reference to the reasonable necessity of the payments in that clause would be superfluous. Instead, the phrases "applicable nonbankruptcy laws" and "to the extent reasonably necessary to be extended" must be interpreted as being conjoined by "in accordance with" so as to complement each other. In other words, a debtor may

**14.** *Webster's Ninth New Collegiate Dictionary*    (1989).

exempt from his current monthly income only those child support payments that are made in conformance with applicable nonbankruptcy law. Stipends from an indulgent uncle will not be excepted. However, even court-ordered child support is not automatically excluded because the debtor must also establish to the bankruptcy court's own satisfaction that the expenditure of that support is reasonably necessary for the child.

■ Similarly, Section 1325(b)(3) should not be interpreted as categorically substituting the Section 707(b)(2) expense restrictions for the "reasonably necessary" expense requirement already imposed by Section 1325(b)(2). Rather, it should be interpreted as offering a further guideline for ensuring that the expenses claimed by an above-median-income debtor are reasonably necessary. Put differently, Section 1325(b)(3) imposes the same requirement upon an above-median-income debtor as it does upon all other debtors: amounts claimed as expenses under Section 1325(b)(3) must in fact be ultimately expended. *McPherson,* 350 B.R. at 45. However, Section 1325(b)(3) imposes upon an above-median-income debtor the further requirement that all planned expenditures must also agree with the expense limitations of Sections 707(b)(2)(A) and (B).

If that debtor's planned expenses exceed what is permitted, then the debtor must conform his Section 1325(b) deductions by reducing them to the amounts allowed by those subsections. On the other hand, the converse is not true, for if the debtor's planned expenses are less, then his Section 1325(b) deductions must still be that lesser amount because that is all that he in fact plans to expend.[15]

■ Consequently, it is all well and good that Section 707(b)(2)(A)(iii) itself may permit Debtors in this instance the opportunity to deduct another $839.00 from their current monthly income on account of their second mortgage and their Florida timeshare even though they are above-median-income debtors. However, Section 1325(b), not Section 707, ultimately controls the determination of disposable income for purposes of plan confirmation under Chapter 13, and that section permits Debtors to deduct only those expenditures that are reasonably necessary for their future support and maintenance. Obviously, phantom payments for the Florida timeshare and the second mortgage do not meet this criteria. Therefore, the expense component of Debtors' Section 1325(b) disposable income calculation is overstated by the amount of those claimed deductions.[16]

---

**15.** Sections 707(b)(2)(A) and (B) limit an above-median-income debtor's budget in two ways. First, the National Standards and Local Standards published by the Internal Revenue Service impose ceilings upon what an above-median-income debtor may claim for food, housing and transportation. Second, these subsections establish the other categories of expenses (*e.g.,* taxes, childcare, and telecommunications) that may be deducted. Although the reference to such categories as an additional limitation under Section 1325(b)(3) may seem redundant given that all Section 1325(b)(2) expenses must be actual in any event, the inclusion of these categories also establishes for above-median-income debtors what categories of expenses may not

be used for purposes of the Section 1325(b) calculation.

**16.** I do recognize that Interim Rule 1007(b)(6) requires an above-median-income debtor to calculate the expense component of his Section 1325(b) disposable income "as prescribed by" Form B22C. Consequently, one could, if so inclined, interpret this interim rule as overriding the interpretation I am now giving to Section 1322(b)(3). However, at this point in time the interim rules simply represent the Judicial Conference's recommendations. Granted, this court has incorporated those recommendations into its own local rules so as to facilitate the integration of BAPCPA with its procedures. *See,* Adminis-

### 3. *Combining the Income and Expense Components.*

In *In re Love,* 350 B.R. 611 (Bankr. M.D.Ala.2006), the court suggested that the calculation of monthly disposable income under Section 1325(b) conflicts with fundamental accounting principles by mismatching historical income figures with future expenses. However, there is in fact no conflict. Granted, a fundamental rule of accounting is that the accurate reporting of financial performance for a given period can be achieved only by matching all income earned with all expenses incurred for that period. However, adherence to this maxim is impossible whenever forecasting future performance is attempted. This reality, though, does not mean that the rule should be ignored in such circumstances. The problem is simply how to best match future income with future expenses without a crystal ball.

It is certainly tempting to seize upon the debtor's current circumstances, as manifested in his Schedules I and J, as the best data for predicting a debtor's future performance. However, the fact that Schedules I and J in many instances offer a reasonable standard for predicting the future does not mean that they are always an appropriate measure, let alone the best. For example, a historical average would be better in those instances where the debtor has been steadily employed but his income has nonetheless fluctuated because of periodic overtime. Moreover, forecasting financial performance is an art, not a science. Consequently, prognostications are as much a function of the assumptions made as the existing data selected. Indeed, the assumptions made often dictate the data used.

Nor is it necessary that the projection contemplated by Congress in Section 1325(b) be consistent with the standards used by others to forecast future performance. After all, when all is said and done, Section 1325(b) is nothing more than an arbitrary test that Congress has imposed for purposes of assessing whether the relief afforded by confirmation of a Chapter 13 plan is appropriate or not. One can certainly argue that a debtor's current financial circumstances, as manifested in his Schedules I and J, does provide a court with additional information to assess whether a debtor's proposed payments under his plan represent at that time his best effort. However, more variables means greater uncertainty as to the outcome and it is quite evident that Congress, in enacting BAPCPA, opted for certainty when it further refined the calculation of disposable income under Section 1325(b).

### B. *Applicable Commitment Period.*

As already discussed, the parties agree that 5 years is the Debtors' "applicable commitment period" for purposes of evaluating the Chapter 13 Trustee's Section 1325(b) objection.[17] However, they dis-

---

trative Order No. 2005–4 (Bankruptcy Court, W.D. Mich.2005). However, the interim rules do not have the weight of law because they have yet to be presented to Congress for its approval. 28 U.S.C. § 2075.

**17.** (4) For purposes of this subsection [Section 1325(b)(4)] the "applicable commitment period"—

    (A) subject to subparagraph (B), shall be—

        (i) 3 years; or

        (ii) not less than 5 years, if the current monthly income of the debtor and the debtor's spouse combined, when multiplied by 12, is not less than—

        (I) in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner;

        (II) in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; or

agree as to the limitation this requirement imposes upon Debtors with respect to their plan. The Chapter 13 Trustee advocates what often has been described as the temporal approach to this problem. This approach treats the applicable commitment period, whether it be 3 or 5 years, as establishing the minimum time period within which the debtor must commit his disposable income for the repayment of his unsecured creditors.

On the other hand, Debtors advocate what has been described as the monetary approach. It is Debtors' position that the applicable commitment period is nothing more than another variable in the Section 1325(b) formula devised by Congress. That is, a debtor's disposable income as determined under Section 1325(b) is simply multiplied by this variable, whether it be 36 or 60 months, to arrive at a minimum amount of money the debtor's plan must commit to his unsecured creditors under the plan in order to survive the objection made.

The difference these two approaches can have upon a debtor's plan is well illustrated in the instant case. Debtors argue that they need only commit 60 times the $140.00 they have calculated as their disposable income, or $8,400.00, to the repayment of their unsecured creditors. In contrast, the Chapter 13 Trustee argues that Debtors' commitment to their plan must be in excess of $25,000.00 because they have the ability to pay that much over the duration of a five year plan.[18]

The recent case of *In re Luton*, 2007 WL 756373 (Bankr.W.D.Ark.2007), describes the significant split of authority on this issue.

Although courts disagree on the proper interpretation of 11 U.S.C. § 1325 as amended by BAPCPA, the majority view is that, as to treatment of unsecured creditors, the phrase "applicable commitment period" refers to a period of time and is not merely a multiplier used to determine the amount of distribution to unsecured creditors. Under this view, the debtor may not propose a plan provision to pay the plan off before the applicable commitment period has elapsed.

A variety of reasons support the majority view. *See, e.g., In re Slusher*, 359 B.R. 290, 301 (Bankr.D.Nev.2007) (stating that the applicable commitment period stands for the appropriate amount of time during which the debtor has agreed to make payments); *In re Cushman*, 350 B.R. 207, 212–13 (Bankr.D.S.C.2006) (concluding that Code never refers to applicable commitment period as a multiplier; the legislative history supports this view in that the caption of Section 318 of the Act is "Chapter 13 plan to have five year duration in certain cases"; plain language of statute compels this result); *In re Girodes*, 350 B.R. 31, 35

(III) in the case of a debtor in a household exceeding 4 individuals, the highest median family income of the applicable State for a family of 4 or fewer individuals, plus $525 per month for each individual in excess of 4; and
(B) may be less than 3 or 5 years, whichever is applicable under subparagraph (A), but only if the plan provides for payment in full of all allowed unsecured claims over a shorter period.
11 U.S.C. § 1325(b)(4).

**18.** Of course, the $8,400,00 Debtors have calculated is premised upon the allowance of the Florida timeshare and second mortgage payments ($839.00) as Section 1325(b) deductions. The elimination of those monthly payments increases Debtors' monthly disposable income to $979.00 and the total they must commit over 60 months to $58,740.00. Consequently, the preclusion of those deductions may result in ability to pay concerns shifting from the Chapter 13 Trustee to Debtors.

(Bankr.M.D.N.C.2006) (finding the term "period" imposes temporal rather than monetary requirement); *In re Davis*, 348 B.R. 449, 455–57 (Bankr.E.D.Mich. 2006) (recognizing the word "period" means a chronological division; if Congress had intended a multiplier it could have clearly described it as such; if applicable commitment period is only used as a multiplier, 1325(b)(4)(B) would have no meaning; monetary approach represents a gross departure from pre-BAPCPA practice not justified by the language of the statute; terms "commitment" and "period" contemplate action over a period of time and do not on their face connote a formula to arrive at an amount; legislative history supports this view; this construction would permit debtors to cash out of Chapter 13 to the detriment of creditors); *In re Gress*, 344 B.R. 919, 923 (Bankr.W.D.Mo.2006) (ruling that applicable commitment period is a temporal rather than monetary requirement); *In re Dew*, 344 B.R. at 661 (finding Section 1322 sets maximum periods of plan length; Section 1325(b)(4)(A) sets minimum plan length); *In re Schanuth*, 342 B.R. 601, 607–608 (Bankr.W.D.Mo.2006) (ruling the word "period" denotes a chronological division; 1325(b)(4)(B) provides the only method to shorten the applicable commitment period; if the phrase is a multiplier it renders 1325(b)(4)(B) awkward if not meaningless; if the term is used as a multiplier it would represent a gross departure from pre-BAPCPA practice not justified by the language of the statute); *In re McGuire*, 342 B.R. 608, 615 (Bankr.W.D.Mo.2006) (reasoning that 1325(b)(4)(B) provides the only way to shorten the applicable commitment period; this interpretation does not change pre-BAPCPA practice); *In re Crittendon*, No. 06–10322C–136, 2006 WL 2547102 (Bankr.M.D.N.C. Sept.1, 2006)

(stating that applicable commitment period refers to plan duration and is not a multiplier) (citations omitted).

Opposing the view expressed by the majority is the case of *In re Fuger*, 347 B.R. 94 (Bankr.D.Utah 2006), as well as some well-respected authorities. *See* 5 Keith M. Lundin, Chapter 13 Bankruptcy §§ 493 & 500 (3d ed. 2000 & Supp. 2006); Henry E. Hildebrand, *Unintended Consequences: BAPCPA and the New Disposable Income Test*, Am. Bankr.Inst. J., March 2006, at 14, 54. *See also In re Brady*, 361 B.R. 765, 776 (Bankr.D.N.J.2007) (stating that the applicable commitment period is a requirement that only applies if the debtor has projected disposable income to pay to unsecured creditors under the plan); *In re Lawson*, 361 B.R. 215, 220 (Bankr. D.Utah2007) (finding that the applicable commitment period is fundamentally irrelevant in context of above-median debtors with negative monthly disposable income); *In re Alexander*, 344 B.R. 742, 750–51 (Bankr.E.D.N.C.2006) (recognizing that applicable commitment period is temporal rather than monetary, but ruling that a debtor without projected disposable income may propose a plan for a shorter period than the applicable commitment period); *In re Kagenveama*, No. 05–28079, 2006 Bankr.Lexis 259, at *9 (Bankr.D.Ariz. July 10, 2006) (stating that the applicable commitment period fixes the amount to be paid and the time over which the payment must be made; however, if no payments are required to be paid to unsecureds because the debtor has no projected disposable income, the plan duration will be determined by other types of payments under the plan, such as those to secured creditors).

*In re Luton*, 363 B.R. 96, 99–100 (Bankr. W.D.Ark.2007).

The *Luton* court itself concluded that the majority position was correct and, therefore, adopted the temporal approach. *See also, In re Schanuth,* 342 B.R. 601 (Bankr.W.D.Mo.2006); *In re Davis,* 348 B.R. 449 (Bankr.E.D.Mich.2006).

▇ I concede that *Luton* offers a number of reasonable arguments as to why "applicable commitment period" should be given a temporal meaning. However, I am persuaded that the term must ultimately be afforded the monetary meaning Debtors advocate for the simple reason that any other meaning would undermine what I have already determined to be the proper interpretation of "disposable income" within the same section. It is important to recognize in this instance that the Chapter 13 Trustee is in fact advocating a position that goes beyond the mere issue of plan length Again, Debtors agree that five years is the applicable commitment period for purposes of evaluating the Chapter 13 Trustee's Section 1325(b) objection. However, what the Chapter 13 Trustee asserts is objectionable is not Debtors' proposal to shorten the time within which they are to pay what is required under Section 1325(b) but instead Debtors' apparent ability to afford more than what they claim they are required to pay. Put differently, the Chapter 13 Trustee would not be content if Debtors were to reduce their monthly plan payments to whatever amount would be needed to ensure that the $8,430.00 they propose to pay to unsecured creditors is amortized over the entire five years of their commitment period. Rather, the Chapter 13 Trustee insists that Debtors must also under Section 1325(b) commit to their plan whatever additional disposable income Debtors are currently earning and presumably will continue to earn throughout the entire five-year period.

However, such an approach is nothing more than a backdoor attempt to reintro-duce a debtor's current ability to pay into the Section 1325(b) calculation. In other words, the formula that BAPCPA now imposes under Section 1325(b) would be rendered meaningless if the debtor is in any event obligated under Section 1325(b) to commit to his plan whatever he is capable of now paying. Again, for the reasons I have already given, I am satisfied that disposable income for purposes of Section 1325(b) is to be based in part upon an average of a debtor's past earnings. Therefore, it is inevitable that there will be some instances where the calculation of a debtor's disposable income for purposes of Section 1325(b) will be different from what the debtor is currently earning. If that difference is to have any consequence, and one must assume that it is to have a consequence since it logically derives from the words Congress has chosen, then there is really no alternative other than to treat the applicable commitment period, whether it be 36 months or 60 months, as nothing more than a multiplier to be used in conjunction with the Section 1325(b) formula Congress has now devised.

I recognize, of course, that another alternative is to accept the reasoning in *Luton* and the cases cited therein and to instead reconsider my conclusion as to how disposable income is to be calculated. However, I am satisfied that the language selected by Congress for Section 1325(b)(4) is not so restrictive as to lend itself only to the interpretation offered by those cases or that it cannot otherwise be interpreted in a fashion consistent with the formulaic approach I am adopting.

For example, *Schanuth* and *Davis* both observe that "applicable commitment period" itself suggests a temporal interpretation because the word "period" denotes a division of time. However, these courts are reading too much into this word as well as other words and phrases contained

in Section 1325(b). One must remember that "applicable commitment period" is in reality nothing more than convenient shorthand for communicating the concept that the applicable standard for now evaluating a Section 1325(b) objection will vary depending upon the "current monthly income" (another defined term) of the debtor and his spouse. Consequently, while it is certainly possible that Congress spent considerable time deliberating upon exactly what word it should use to define this concept, it is just as plausible that Congress chose the word "period" to complete the abbreviation it had selected with no more thought as to its connotation than had it chosen "applicable commitment base" instead.

*Schanuth* and *Davis* also note that Congress was perfectly capable of using the word "multiply" had it in fact intended the applicable commitment period to serve only as a multiplier in some formula. Indeed, they observe that Congress used "multiplied" in Section 1325(b) itself when it wished to communicate the idea that current monthly income had to be annualized for purposes of determining whether the applicable commitment period is to be three years or five years and whether the Section 707(b)(2) expense standards must be considered. 11 U.S.C. §§ 1325(b)(3) and (4). However, I do not find this argument to be so persuasive as to preclude as an alternative that Congress simply chose a different method of expressing the function of multiplication in Section 1325(b)(2). Indeed, acceptance of this alternative explanation is particularly compelling when one recognizes that the reasoning of *Schanuth* and *Davis* leads to the same contradictions presented when

"projected disposable income" is interpreted as representing anything other than a simple algorithm.

Section 1325(b)(4)(B) is another code section relied upon by *Schanuth, Davis,* and other courts that have adopted the temporal approach. That subsection provides that the "applicable commitment period—

\*　　\*　　\*　　\*　　\*　　\*

(B) may be less than 3 or 5 years, whichever is applicable under subparagraph (A), but only if the plan provides for payment in full of all allowed unsecured claims over a shorter period.

11 U.S.C. § 1325(b)(4)(B).

The argument is that a monetary interpretation of Section 1325(b) makes this subsection at best awkward and, at worst, meaningless. However, as awkward as the language chosen may be under such an interpretation, Section 1325(b)(4)(B) does serve a function under the monetary approach, for it guarantees that the multiplier to be used for calculating the amount necessary to withstand a Section 1325(b) objection can never be greater than what would be necessary to fund a 100% plan to unsecured creditors. Perhaps Congress could have chosen more elegant language. Perhaps it could have elected to omit the language altogether as stating what would seem to be obvious. However, a courts' role is to interpret what Congress has enacted, not to edit it. *Lamie v. U.S. Trustee,* 540 U.S. 526, 536, 124 S.Ct. 1023, 1031, 157 L.Ed.2d 1024 (2004). In this instance, Section 1325(b)(4)(A) fits without causing an inconsistency in the monetary approach and that is enough.[19]

---

19. Of course, this interpretation of Section 1325(b)(4)(B) would appear to render superfluous Section 1325(b)(1)(A). However, subsection 1325(b)(1)(A)'s purpose is to negate the objection of a priority creditor who will

otherwise be paid in full under the plan. Suppose, for example, that a debtor has both tax liabilities entitled to priority and ordinary unsecured debt. The debtor would have to propose a plan whereby the tax creditors

*Davis* also cites the duties debtors have under Sections 521(a)(1)(B)(vi) and 521(f) to provide post-confirmation financial information and income tax returns as further support for its decision. *Davis* argues that no purpose is served by imposing upon the debtor this ongoing obligation to report if the debtor can simply cash out his plan by paying a predetermined amount. *Davis*, 348 B.R. at 458. However, this criticism is valid for only those debtors who in fact have the wherewithal to accelerate the payment of their plan obligations. There will undoubtedly be instances where the peculiarities of the Section 1325(b) calculations will put a debtor into the position whereby his current and/or anticipated earnings permit him to pay the 1325(b) amount in a much shorter period of time than the applicable commitment period would suggest. However, I suspect that there will be far more debtors whose circumstances will require them to use most, if not all, of that time. Indeed, below-median-income debtors who had been earning high wages but who have been downsized to lower paying jobs in all likelihood will need more than the allocated 36 months to meet their Section 1325(b) requirement.

These new reporting duties certainly serve a purpose in all of these other instances, for the reports generated will permit the Chapter 13 trustee and other eligible parties to make informed decisions as to whether post-confirmation modifications to the debtor's plan are appropriate. Moreover, I do not agree with the insinuation that a debtor who is able to accelerate

the payment of his plan is cheating the system. Granted, accelerated payments do reduce the window of opportunity for a Chapter 13 trustee, for example, to modify a debtor's plan to reflect a favorable change in the debtor's post-confirmation fortunes. On the other hand, accelerating payment also means that the debtor's creditors will not only benefit from the interest differential realized from receiving payment earlier but also will avoid the risk of the debtor suffering an adverse change in circumstances over the extended interval.

The final reason that has been given to justify the temporal approach is deference to pre-BAPCPA practice. *Davis* described that practice as follows:

In 1984, Congress amended the Bankruptcy Code by the Bankruptcy Amendments and Federal Judgeship Act of 1984. That act added § 1325(b) to the Code. This new section addressed the minimal length of the plan issue in part, by providing that if the trustee or an unsecured creditor objected to a plan, the plan could not be confirmed unless one of two circumstances occurred: either the plan distributed property having a value of not less than the full amount of the unsecured claims under § 1325(b)(1)(A), or the plan provided that all of the debtor's projected disposable income to be received in the three years after the first payment was due would be applied to the plan. In short, if the debtor's plan did not pay unsecured claims in full, then upon objection by an unsecured creditor or a trustee, the debtor would be required to continue

---

would be paid in full unless those creditors agreed otherwise. 11 U.S.C. § 1322(a)(2). However, the debtor might still want to defer payments to these creditors until after he had paid whatever he intends to pay to his unsecured, non-priority creditors. The non-priority unsecured creditors and the Chapter 13

trustee could certainly object to such a plan under Section 1325(b)(1)(B) unless the debtor met the disposable income requirement set by that subsection. However, the priority tax creditor would not have the same prerogative because its objection would be addressed by Section 1325(b)(1)(A).

to make plan payments in the future, out of the disposable income she projected to be received over the next three years. This became known as the "best efforts" test. Although not requiring a minimum length of a plan in all cases, it did require a debtor who was not paying unsecured claims in full to make her "best efforts" for three years, if the trustee or an unsecured creditor objected. If she did so, the debtor could still obtain a Chapter 13 discharge. The bargain was fair and it was easy to understand.

After that change was made in 1984, Bankruptcy Courts became accustomed to examining a debtor's income and expenses to determine what expenses are reasonable and necessary for the maintenance and support of the debtor and her dependents in order to ascertain a debtor's projected disposable income. The starting point, of course, was the debtor's schedules I and J which set forth the debtor's actual income and expenses on a monthly basis. This seemed to provide debtors, trustees, creditors and the courts with a workable framework for analysis to achieve a result consistent with the purposes of Chapter 13: to facilitate voluntary repayment of debt by individuals with regular income, provide them with a discharge of debts if they completed their plan, and deliver to creditors a recovery at least as great as they would receive in a Chapter 7 liquidation, all without a forced liquidation of the debtor's assets.

*In re Davis*, 348 B.R. at 452–53.

*Davis* then concluded with this observation:

Whatever perceived value may exist in BAPCPA's adoption of a rigid formula means test to determine eligibility for an individual to file Chapter 7, its partial importation into Chapter 13 fits about as well as a square peg in a round hole. It will undoubtedly effectuate changes, some unintended, in Chapter 13 practice and in the requirements for confirmation of a Chapter 13 plan. However, the Court is not persuaded that one of these changes is the elimination of a minimum length of plan payments for a debtor who does not pay unsecured creditors in full. In this Court's view, a debtor's applicable commitment period, as determined by § 1325(b)(4), does impose a minimum *length* of plan, rather than a calculation of a minimum *amount*, by application of § 1325(b)(1)(B) to debtors whose Chapter 13 plans do not pay unsecured creditors in full and whose plans are the subject of an objection by a trustee or an unsecured creditor. For these reasons, the Trustee's objection is sustained and confirmation of the Debtor's plan is denied.

*Id.* at 458 (emphasis added).

However, after looking more closely at Section 1325(b), I am not convinced that *Davis* correctly describes how Section 1325(b) should have been administered prior to the enactment of BAPCPA. Section 1325(b) certainly has been interpreted since its inception as requiring a debtor to propose a Chapter 13 plan that committed all of the debtor's disposable income for a period of 36 months if either the Chapter 13 trustee or a party in interest made that demand. "Projected," though, preceded "disposable income" even before BAPCPA. Indeed, it has been part of Section 1325(b) since it was first added in 1984. As already discussed, many courts have focused upon "projected" to explain why a debtor's ability to pay must still be considered when a post-BAPCPA Section 1325(b) objection is made. Perhaps the more appropriate question, though, is what did Congress intend "projected disposable income" to mean prior to BAPCPA's enactment?

A fundamental rule of statutory construction is that every word within a statute must have a meaning. *U.S. v. Nordic Village, Inc.*, 503 U.S. 30, 36, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992) (The Court observing that "a statute must, if possible, be construed in such a fashion that every word have some operative effect."). However, "projected," as a modifier of "disposable income," is superfluous if pre-BAPCPA Section 1325(b) is to have the temporal meaning *Davis* suggests. In other words, the temporal notion of a pre-BAPCPA debtor being required under Section 1325(b) to commit all of his income for three years could have been expressed just as well by omitting "projected" from that section—"the court may not approve the plan unless ... the plan provides that all of the debtor's ... **disposable income** to be received in three years ... will be applied to make payments under the plan."

Therefore, I suggest that Congress placed "projected" before "disposable income" when it originally enacted Section 1325(b) to communicate its intention that the additional confirmation hurdle it was creating was to be just a mathematical test. Projected, after all, can have simply an arithmetic meaning. For example, "Adam *projected* revenues by multiplying average historical sales by the program's expected *duration.*"

That Congress contemplated all along a simple, one-time comparison or "snapshot," if you will, of what the debtor was proposing to pay creditors under his plan with an objective, mathematical standard is reinforced by the direction in both pre- and post-BAPCPA Section 1325(b) that the court's perspective in applying the standard is to be "as of the effective date of the plan." [20] This phrase too would be superfluous if Congress had intended Section 1325(b)(1)(B) to impose upon the debtor a temporal obligation to commit all of his disposable income for whatever is to be the applicable time period. On the other hand, setting the plan's effective date as a reference point for purposes of Section 1325(b) does have meaning if Section 1325(b)(1)(B) is instead interpreted as a mathematical formula designed by Congress to provide a figure that courts are to use at the time of confirmation to objectively assess whether the debtor's proposed payments under his plan represent his best efforts.

I am also satisfied that Congress' recent amendment of Section 1325(b) to further define "disposable income" is only a refinement of the arithmetic approach it contemplated all along. A debtor has always had the right to make his plan payments over whatever time best suited him, provided, of course, his plan was otherwise confirmable. Remember that it is Section 1322(d), and not Section 1325(b), that dictates the duration of a debtor's Chapter 13 plan and that that section has never set a minimum time frame within which the debtor must make the payments required of him under his plan. Indeed, this flexibility remains a fixture of Chapter 13 planning even after BAPCPA, for Section 1322(d) still speaks in terms of the plan being no longer than a

---

**20.** (b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, **as of the effective date of the plan—**

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

11 U.S.C. § 1325(b)(1) (emphasis added).

specified period of time as opposed to mandating a minimum plan length. The only change BAPCPA has made to Section 1322(d) is that an above-median-income debtor can now propose a plan that is up to five years long without first securing the court's approval.

In fairness, it was easy to assume prior to BAPCPA that all plans required a minimum three year length because Section 1325(b) as then enacted seldom offered the debtor the opportunity to propose anything less. The possibility, of course, always existed for a pre-BAPCPA debtor to live on a budget below what was required by Section 1325(b) and then use the savings realized to accelerate completion of his plan. However, the likelihood of any debtor actually proposing such a pre-BAPCPA arrangement was small given that the proponent not only would have had to have desired such an austere lifestyle but also would have had to have convinced the Chapter 13 trustee and creditors that his chosen budget was in fact less than what Section 1325(b) required in the first place.

Ironically, it is BAPCPA itself that has brought to the forefront the spectre of accelerated plans. For example, changing the income component for the Section 1325(b) disposable income calculation of-

fers a significant opportunity for certain debtors. *Davis* observed that the "starting point" for determining disposable income prior to BAPCPA had been "the debtor's schedules I and J which set forth the debtor's actual income and expenses on a monthly basis." *Davis*, 348 B.R. at 452–53. However, as already discussed, BAPCPA changed the formula by requiring the debtor instead to determine his disposable income based upon a historical average. Certain debtors now find themselves in the fortunate situation of earning more at the time of plan confirmation than what was indicated by that average.[21] Consequently, it should be no surprise that these debtors are taking advantage of a previously unavailable opportunity to complete their plans in less time than was typically needed prior to BAPCPA.

However, the perceived injustice wrought by this change in definition does not give the courts a license to jettison what Congress has intended all along to be a formula for objectively testing plans proposed by Chapter 13 debtors. It is certainly possible that Congress did not foresee some of the outcomes, desirable or not, that have resulted from its decision to now use a historical average as the income component for the Section 1325(b) formula.

**21.** *See also, In re Alexander*, 344 B.R. at 750:

To veterans of Chapter 13 practice, it runs afoul of basic principles to suggest that a debtor with no disposable income can nonetheless propose a confirmable plan. Yet BAPCPA permits precisely that. Because the pre-BAPCPA definition of "disposable income" calculated a real number rather than a statutory artifact, it largely mirrored § 1322(a)(1)'s basic requirement that the debtor have future earnings or income "as is necessary for the execution of the plan." 11 U.S.C. § 1322(a)(1). Because disposable income largely took into consideration all income and all expenses, a debtor with no positive number simply had no means to fund the added costs of a

Chapter 13 plan. The result is different under BAPCPA. For any number of reasons, because a debtor has income not counted in the definition of current monthly income, has housing or transportation expenses less than the permissible IRS deductions, has huge secured debt for luxury items that, bizarrely, may be deducted in full as a reasonable and necessary expense, or wishes to continue to contribute to or repay a loan to her 401(k) plan rather than pay her unsecured creditors, a debtor under the new "disposable income" test may show a zero or negative number, yet may be able to make the required showing that she actually has enough income to fund a confirmable plan.

If that is so, then the proper recourse is to petition Congress to make the appropriate correction to the definition it has chosen. However, until that change is made, the courts have no choice but to enforce Section 1325(b) as written.

## II. *Good Faith*

The Chapter 13 Trustee's alternative objection is that Debtors have not proposed their plan in good faith because they are able to pay their creditors significantly more than what they in fact are proposing. 11 U.S.C. § 1325(a)(3). What is meant by "good faith" has been controversial from the time the Bankruptcy Code first became effective in 1980. Many still remember the early debates as to whether a debtor's plan had to offer a minimum dividend to unsecured creditors in order to be in good faith. Many also recall that Section 1325(b) represents Congress's attempt in 1984 to resolve this hotly contested issue. Indeed, a number of courts concluded after its enactment that Section 1325(b) had supplanted altogether Section 1325(a)(3) as the test to determine whether the distribution proposed by a debtor under his plan was sufficient to warrant confirmation. *See, e.g., Noreen v. Slattengren,* 974 F.2d 75, 76 (8th Cir.1992); *In re Smith,* 848 F.2d 813, 820 (7th Cir.1988); *Education Assistance Corp. v. Zellner,* 827 F.2d 1222, 1227 (8th Cir.1987); *Keach v. Boyajian (In re Keach)* 243 B.R. 851 (1st Cir.BAP2000).

BAPCPA's amendment of Section 1325(b) has rekindled this debate by creating situations where the debtor can meet the objective standard imposed by that section without actually having to commit to his plan all that he can at least currently afford. As just discussed, this divergence has resulted in a considerable amount of discussion concerning how Section 1325(b) is to be now interpreted. However, some, like the Chapter 13 Trustee in this instance, contend that a debtor's duty under Section 1325(a)(3) to propose his plan in good faith ultimately requires him to commit to his plan whatever he can afford regardless of what Section 1325(b) might otherwise dictate.

Several courts have rejected this alternative argument, holding instead that a debtor's ability to pay continues to be relevant only as permitted by Section 1325(b). *In re Barr,* 341 B.R. 181 (Bankr.M.D.N.C. 2006); *In re Farrar–Johnson,* 353 B.R. 224 (Bankr.N.D.Ill.2006); *In re Alexander,* 344 B.R. 742 (Bankr.E.D.N.C.2006); *In re Winokur,* 364 B.R. 204 (Bankr.E.D.Va. 2007).[22] In effect, these courts have interpreted the BAPCPA amendments to Section 1325(b) as creating a safe harbor for debtors as well.

This court agrees with the opinion rendered by the Bankruptcy Court for the Middle District of North Carolina that the debtor's disposable income must be determined under § 1325(B) and not as an element of good faith under § 1325(a)(3). *In re Barr,* 341 B.R. 181, 186 (Bankr.M.D.N.C.2006); *see also* Marianne B. Culhane & Michaela M. White, *Catching Can–Pay Debtors: Is the Means Test the Only Way?,* 13 Am. Bankr.Inst. L.Rev. 665, 681 (2005)( "[T]he very specific language of section 1325(b)(2) displaces any such use of chapter 13 'good faith,' even assuming that phrase has any relevance to minimum payments after the 1984 amendments. Once again, Congress demonstrated a determination to replace judicial discretion under general

---

**22.** *But see, In re Edmunds,* 350 B.R. 636 (Bankr.D.S.C.2006); *In re Devilliers,* 358 B.R. 849 (Bankr.E.D.La.2007).

standards with precise rules-based calculations. One can understand why bankruptcy judges would chafe at such restrictions, but that does not mean that Congress did not mean what it said."). So long as the debtor calculates the projected disposable income with specific reference to the new definition of disposable income and commits that projected disposable income to pay unsecured creditors for the applicable commitment period, she is in good faith compliance with the Code. § 1325(b)(1)(B).

*Alexander,* 344 B.R. at 752.

However, *Barr* and like-minded courts have offered little independent analysis to justify the safe harbor they have found in Section 1325(b). Rather, they have simply accepted as still good law the pre-BAPCPA interpretation given by courts such as *Noreen* and *Zellner* to the relationship between Section 1325(b) "best efforts" and Section 1325(a)(3) "good faith." As the court in *Farrar–Johnson* observed "this kind of good faith objection [*i.e.,* debtor's ability to pay] has had little or no potency since the 1984 amendments to the Code." *Farrar–Johnson,* 353 B.R. at 232.

The Sixth Circuit, though, has not joined in what *Barr* suggests is a unanimous pre-BAPCPA interpretation of the interplay between these two sections. In *Metro Employees Credit Union v. Okoreeh–Baah (In re Okoreeh–Baah),* 836 F.2d 1030 (6th Cir.1988), the court was asked to consider whether the debtors' broken promise to pledge pre-petition collateral to the objecting creditor constituted "bad faith" within the meaning of Section 1325(a)(3). Both the bankruptcy court and the district court had found bad faith based upon the prior Sixth Circuit decision in *Memphis Bank & Trust Company v. Whitman,* 692 F.2d 427 (6th Cir. 1982). Those courts had interpreted *Memphis Bank* as imposing a "mechanical, bright line" rule whereby confirmation was to be denied anytime the debtor had engaged in questionable pre-petition conduct.

However, *Okoreeh–Baah* rejected this interpretation as too rigid. It concluded instead that Section 1325(a)(3) good faith requires considering the "totality of the circumstances," including mitigating factors. 836 F.2d at 1032. The court in a footnote then set out a list of twelve non-inclusive factors that could be relevant to such a holistic evaluation.[23] Many of the

---

**23.** (a) the amount of income of the debtor and the debtor's spouse from all sources;
(b) the regular and recurring living expenses for the debtor and his dependants;
(c) the amount of the attorney's fees to be awarded in the case and paid by the debtor;
(d) the probable or expected duration of the Chapter 13 plan;
(e) the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13;
(f) the ability of the debtor to earn and the likelihood of future increase or diminution of earnings;
(g) special situations such as inordinate medical expense, or unusual care required for any member of the debtor's family;
(h) the frequency with which the debtor has sought relief under any section or title

of the Bankruptcy Reform Act or its predecessor's statutes;
(i) the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealing with his creditors;
(j) whether the amount or percentage of payment offered by the particular debtor would operate or be a mockery of honest, hard-working, well-intended debtors who pay a higher percentage of their claims consistent with the purpose and spirit of Chapter 13;
(k) the burden which the administration of the plan would place on the trustee; and
(*l*) the salutary rehabilitative provisions of the Bankruptcy Reform Act of 1978 which are to be construed liberally in favor of the debtor.

factors listed were reflective of the debtor's ability to pay (*e.g.*, the amount of the debtor's income and the debtor's regular and recurring living expenses).

The Sixth Circuit thereafter refined its interpretation of Section 1325(a)(3) "good faith" in *In re Caldwell*, 851 F.2d 852 (6th Cir.1988) ("*Caldwell I* ") and *In re Caldwell*, 895 F.2d 1123 (6th Cir.1990) ("*Caldwell II* "). Both decisions involved the same Chapter 13 proceeding. The bankruptcy court had confirmed the debtor's Chapter 13 plan over a creditor's objection, finding specifically that the debtor had proposed his plan in good faith.[24] The district court then vacated the bankruptcy court's confirmation order and the debtor appealed to the Sixth Circuit for the first time.

*Caldwell I* remanded the appeal to the district court with directions to give a more explicit explanation as to why it had vacated the confirmation order. *Caldwell II* was prompted by debtor's appeal of the district court's subsequent determination that the bankruptcy court should not have confirmed the debtor's Chapter 13 plan because it had not been proposed in good faith as required by Section 1325(a)(3).

The Sixth Circuit was no more concerned in *Caldwell I* or *Caldwell II* about Section 1325(b) having preempted its authority to consider ability to pay factors under Section 1325(a)(3) good faith than it was in *Okoreeh–Baah*.

The party who seeks a discharge under Chapter 13 bears the burden of proving good faith. *Girdaukas*, 92 B.R. at 376. **Best efforts under 11 U.S.C. § 1325(b), without more, are not enough.** *Id.* at 377.

*Caldwell II*, 895 F.2d at 1126 (emphasis added).

The Sixth Circuit also cited with approval the following passage from *Okoreeh–Baah*:

> Good faith is an amorphous notion, largely defined by factual inquiry. In a good faith analysis, the infinite variety of factors facing any particular debtor must be weighed carefully. We cannot here promulgate any precise formulae or measurements to be deployed in a mechanical good faith equation. The bankruptcy court must ultimately determine whether the debtor's plan, given his or her individual circumstances, satisfies the purposes undergirding Chapter 13: **a sincerely-intended repayment of prepetition debt consistent with the debtor's available resources.** The decision should be left simply to the bankruptcy court's common sense and judgment.

*Caldwell I*, 851 F.2d at 858–9 (quoting from *Okoreeh–Baah*, 836 F.2d at 1033) (emphasis added). *See also, In re Francis*, 273 B.R. 87, 92 (6th Cir.BAP2002).

Finally, *Caldwell I* cited a new list of factors to consider for purposes of determining Section 1325(a)(3) good faith.[25]

---

836 F.2d at 1032 n. 3 (citing *In re Kull*, 12 B.R. 654 (S.D.Ga.1981) *aff'd sub nom. In re Kitchens*, 702 F.2d 885 (11th Cir.1983)).

**24.** *Caldwell II* indicates that the bankruptcy court decided the issue of good faith in the context of the debtor's preceding effort to reopen his prior Chapter 7 case and then convert that case to a Chapter 13 proceeding. However, it appears that the panel in the *Caldwell II* was mistaken. In any event, this discrepancy between the two *Caldwells* is not

material to either panel's discussion regarding Section 1325(a)(3) good faith.

**25.** (1) the amount of the proposed payments and the amount of the debtor's surplus; (2) the debtor's employment history, ability to earn and likelihood of future increases in income; (3) the probable or expected duration of the plan; (4) the accuracy of the plan's statements of the debts, expenses and percentage repay-

This list was taken from *In re Estus*, 695 F.2d 311 (8th Cir.1982). The substitution of this list for the list given in *Okoreeh–Baah* is not substantively significant, for, as *Caldwell I* observed, the two lists "basically are the same." *Caldwell I*, 851 F.2d at 859. However, what is important is that *Caldwell I* adopted the *Estus* list one year after the Eighth Circuit itself determined in *Zellner* that most of the *Estus* factors had been subsumed by the ability to pay criteria of Section 1325(b) when it had been enacted in 1984. *Zellner*, 827 F.2d at 1227. Consequently, there is no question that the Sixth Circuit is not in agreement with *Zellner* or any of the other cases cited by *Barr* as support for its conclusion that a debtor's ability to pay is not an appropriate subject for consideration under Section 1325(a)(3).[26]

However, even if one accepts, for the sake of argument, that *Zellner*, and not *Caldwell I*, is to be the prevailing pre-BAPCPA interpretation of the Section 1325(b)/Section 1325(a)(3) relationship, I do not agree with *Barr* 's further conclusion that BAPCPA left this interpretation unchanged, for *Barr* ignores altogether the substantial changes made by BAPCPA to the related issue of abusive practices in Chapter 7 proceedings. Specifically, Congress added to Section 707(b) a so-called "means test" that, like amended Section 1325(b), is to establish a more objective standard for assessing the worthiness, if you will, of debtors seeking bankruptcy relief. If a Chapter 7 debtor falls outside the standard set by Section 707(b)(2), then that debtor is virtually assured that his Chapter 7 will be dismissed, just as a Chapter 13 debtor is virtually assured that his plan will not be confirmed if it does not comport with the standard now imposed under Section 1325(b).[27] Indeed, post-BAPCPA Section 1325(b) establishes its kinship with Section 707(b)(2) by not only using the same defined term, "current monthly income," to establish the income component for calculating disposable income under that section but also by requiring consideration of subparts (A) and (B) of Section 707(b)(2) with respect to the expense component for that same calculation when above-median-income debtors are involved.

ment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;
(5) the extent of preferential treatment between classes of creditors;
(6) the extent to which secured claims are modified;
(7) the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7;
(8) the existence of special circumstances such as inordinate medical expenses;
(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;
(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and
(11) the burden which the plan's administration would place upon the trustee.
*Caldwell I*, 851 F.2d at 859.
*Caldwell I* then added four more factors for good measure.

**26.** Other circuits have also continued to view good faith under Section 1325(a)(3) as involving consideration of not only conduct factors but also ability to pay factors even after the enactment of the Section 1325(b) minimum payment requirements of 1984. *See, e.g. In re Smith*, 286 F.3d 461 (7th Cir.2002); *In re Tucker*, 989 F.2d 328 (9th Cir.1993); *In re Rasmussen*, 888 F.2d 703, 704 (10th Cir. 1989).

**27.** Dismissal under Section 707(b)(2) is not completely guaranteed because the debtor has the ability, albeit limited, to rebut the presumption under Section 707(b)(2)(B). As for Section 1325(b), the debtor may avoid the application of that section altogether if neither the Chapter 13 trustee or another eligible party files an objection.

Moreover, BAPCPA added a new subpart (3) to Section 707(b).

(3) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption in subparagraph (A)(i) of such paragraph does not arise or is rebutted, the court shall consider—

(A) whether the debtor filed the petition in bad faith; or

(B) the totality of the circumstances (including whether the debtor seeks to reject a personal services contract and the financial need for such rejection as sought by the debtor) of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b)(3).

Obviously, consideration under Section 707(b)(3)(A) of a debtor's bad faith in filing for purposes of Chapter 7 dismissal is analogous to consideration under Section 1325(a)(7) of a debtor's good faith in filing for purposes of Chapter 13 confirmation. Similarly, the "totality of the circumstances" approach referenced in Section 707(b)(3)(B) mirrors the same totality of the circumstances approach adopted by the Sixth Circuit in *Caldwell I* in its interpretation of Section 1325(a)(3) good faith.

A number of courts have already considered the interplay between Sections 707(b)(2) and (b)(3) and, not surprisingly, issues have arisen similar to those that have arisen when the interplay of Section 1325(a)(3) good faith and Section 1325(b) best efforts has been considered. For example, above-median-income debtors who have "passed" the Section 707(b)(2) means test have argued on several occasions that their ability to pay cannot be tested a second time should either the court or the United States Trustee still pursue dismissal under the alternative Section

707(b)(3)(B) theory. In other words, Chapter 7 debtors contend that Section 707(b)(2) offers them a safe harbor from ability to pay considerations under Section 707(b)(3)(B) just as Chapter 13 debtors contend that Section 1325(b) is a safe harbor from ability to pay considerations under Section 1325(a)(3) good faith.

The academic support for this position derives from an article entitled *"Catching Can–Pay Debtors: Is the Means Test the Only Way?"* [28] In this article, Professors Culhane and White argue that the Section 707(b)(2) means test is the only method available to the court to assess whether a debtor's ability to pay is such that his case is abusive under Chapter 7.

To say that judges are free under section 707(b)(3) to substitute their own can-pay standards for Congress' means test would render the means test superfluous. Yet the canons of statutory construction require just the opposite, and direct courts to construe the provisions within a statute to be consistent with each other, and to give meaning to all parts. The general abuse section has a role, but ..., it is a limited one that does not replace the means test's many detailed rules with alternate tests of ability to pay. Section 707(b)(3)'s "bad faith" and "totality of the circumstances" standards must give way to the more specific means test algorithm. "[I]t is a commonplace of statutory construction that the specific governs the general..."

13 Am. Bankr.Inst. L.Rev. at 682 (footnotes omitted).

However, the courts have not been persuaded by this argument. For example, *In re Mestemaker,* 359 B.R. 849 (Bankr. N.D.Ohio 2007) involved above-median-income debtors who had passed the Section 707(b)(2) means test. Consequently, there

---

**28.** Marianne Culhane and Michaela White, 13    Am. Bankr.Inst. L.Rev. 665 (2005).

was no presumption that their Chapter 7 case was abusive. Nonetheless, the United States Trustee filed a Section 707(b) motion to dismiss on the theory that the debtors' financial condition, when the totality of their circumstances was considered, still evidenced abuse under Section 707(b)(3). The United States Trustee's argument relied in part upon his argument that the debtors' Schedules I and J disclosed that debtors were in fact earning $299.45 in excess of their monthly expenses.

The debtors argued that consideration of their Schedules I and J was irrelevant because their ability to pay had already been tested under Section 707(b)(2). The court disagreed.

> In light of the fact that Congress specifically addressed the situation where a debtor has greater expenses and/or lower income than what is accounted for under the means test calculation, it is unreasonable to interpret § 707(b) as not providing for circumstances where a debtor has fewer expenses and/or higher income than what is set forth under the means test. The plain language of § 707(b)(3) provides for a court to consider that very circumstance. Specifically, in determining whether granting relief would be an abuse of the provisions of Chapter 7 in a case in which the presumption "does not arise or is rebutted," a court is required to consider whether "the totality of the circumstances ... of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(B). **The plain meaning of**

> **the phrase "debtor's financial situation" must include a debtor's actual income and expenses, since such information is the starting point for any analysis of an individual's financial situation. There is no provision in § 707(b) stating that the means test is the only method through which a court may determine whether there is abuse based on a debtor's ability to pay. Rather, the plain language of § 707(b)(3), read in conjunction with § 707(b)(1) and (2), is clear and compels a conclusion that a court must consider a debtor's actual debt-paying ability in ruling on a motion to dismiss based on abuse where the presumption does not arise or is rebutted.**

*Id.* at 854–855 (emphasis added).

The court then granted the motion. *See also, In re Henebury,* 361 B.R. 595, 607 (Bankr.S.D.Fla.2007) (court holding that "[e]ither ability to pay or bad conduct in connection with the bankruptcy will warrant dismissal for abuse under § 707(b)(3).").[29]

*In re Nockerts,* 357 B.R. 497 (Bankr. E.D.Wis.2006) stands alone in offering some concession to the safe harbor position advocated in the Culhane & White article. However, even *Nockerts* ultimately holds that ability to pay is relevant when considering Section 707(b)(3) motions based upon the debtor's financial circumstances. *Nockerts* strays from *Mestemaker* and *Henebury* only to the extent that *Nockerts* holds that ability to pay cannot be the sole basis for a Section 707(b)(3)(B) dismissal.

---

**29.** *Mestemaker* and *Henebury* both involved above-median-income debtors. There is a second line of decisions involving so-called "below-median-income" debtors where the courts have likewise held that the debtor's ability to pay may be considered in conjunction with the court's overall assessment of the debtor's financial condition under Section 707(b)(3)(B). *See, e.g., In re Pfeifer,* 365 B.R. 187 (Bankr.D.Mont.2007); *In re Schoen,* 2007 WL 643295 (Bankr.D.Kan.); *In re Pak,* 343 B.R. 239 (Bankr.N.D.Cal.2006); *In re Paret,* 347 B.R. 12 (Bankr.D.Del.2006); *In re Pennington,* 348 B.R. 647 (Bankr.D.Del.2006); *In re Simmons,* 357 B.R. 480 (Bankr.N.D.Ohio 2006).

Under the pre-BAPCPA totality of the circumstances test, proof of more than just an ability to fund a chapter 13 plan was needed to demonstrate "substantial abuse." *Green*, 934 F.2d at 572. Stated another way, while ability to pay is a factor in the totality of circumstances test, and may even be the primary factor to be considered, if it is the only indicia of abuse, the case should not be dismissed under that test. Given the detailed nature of the means test in § 707(b)(2), this Court holds that similar to the old totality of the circumstances test, more than an ability to pay (as shown on the debtor's Schedule I and J) must be shown to demonstrate abuse under § 707(b)(3)(B).

*Nockerts* at 507.[30]

■ To summarize, the developing body of case law recognizes a relationship between Section 707(b)(2) and Section 707(b)(3)(B) whereby all debtors must sub-

---

**30.** I, like the courts in *Henebury* and *Pfeifer*, respectfully disagree with *Nockerts'* determination that a debtor's ability to pay cannot alone warrant dismissal of a Chapter 7 proceeding unless the Section 707(b)(2) presumption also applies. I do agree with *Nockerts* that ability to pay is not the only factor that is worthy of consideration under Section 707(b)(3)(B). Section 707(b)(3)(B) is by its very nature fact intensive. There could be in any particular case a whole host of circumstances that a court would have to consider before making any final assessment as to the debtor's financial condition under that section.

Indeed, it would appear that non-financial factors could also still be relevant, for Section 707(b)(3)(B) requires only that the court consider the debtor's financial condition in connection with the broader question of whether there has been an abuse under Section 707(b)(1). The implication, of course, is that there may be factors outside of the debtor's financial condition that would mitigate a finding of abuse otherwise justified under Section 707(b)(3)(B) or, alternatively, there may be other factors that would warrant a finding of abuse even though consideration of only financial circumstances under Section 707(b)(3)(B) would not.

Consequently, I do not interpret the addition of Section 707(b)(3) as materially altering the "totality of the circumstances" approach that the Sixth Circuit had adopted in *In re Krohn*, 886 F.2d 123 (6th Cir.1989) well before BAPCPA's enactment. In other words, whether dismissal is appropriate under Section 707(b)(1) is still a fact-intensive exercise unless the presumption now imposed by Section 707(b)(2) applies.

However, I find no justification for *Nockerts'* further conclusion that something more than mere ability to pay must always be shown to warrant Section 707(b)(1) dismissal, for there will certainly be situations where the debtor's ability to pay is so significant that abuse is evident regardless of the existence of other contributing or mitigating factors. *See, e.g., In re Staub*, 256 B.R. 567 (Bankr.M.D.Pa. 2000) (Chapter 7 dismissed for Section 707(b) substantial abuse because non-filing spouse earned over $16,000 net income per month). Neither *Krohn* nor the subsequent decision in *In re Behlke*, 358 F.3d 429 (6th Cir.2004) preclude altogether the possibility that ability to pay alone could justify Section 707(b) dismissal. Those cases only require that the court consider all other aspects of the debtor's circumstances, including overall financial condition and the bona fides of his decision to file, before making that determination.

I also disagree with *Nockerts'* conclusion that a separate consideration of the debtor's ability to pay under the subjective standard of Section 707(b)(3)(B) frustrates Congress' purpose in establishing the objective standard imposed by the means test under Section 707(b)(2). There is no question that BAPCPA, by imposing the Section 707(b)(2) presumption, limits what had been until then the courts' unfettered right to assess Chapter 7 filings for abuse as each case presented itself. However, I do not perceive that the limitation Congress has imposed is also to be a prohibition. The courts have not lost their power to otherwise police Chapter 7 proceedings for abuse. Indeed, I interpret Section 707(b)(3)(B) as Congress' affirmation that the courts are to continue to use their own judgment as a secondary snare to catch debtors of means who for one reason or another have managed to avoid the net that Congress itself has now cast through its enactment of the Section 707(b)(2) presumption.

mit first to an objective evaluation of their financial circumstances and perhaps then a second, subjective evaluation of their financial circumstances as well. Therefore, it stands to reason that BAPCPA includes a similar objective/subjective dichotomy between Section 1325(b) and Section 1325(a)(3), for it is essential that these two sections mirror Sections 707(b)(2) and (b)(3)(B). Assume, for example, that an above-median-income Chapter 7 debtor has passed the Section 707(b)(2) means test but that his financial circumstances nonetheless warrant dismissal because of Section 707(b)(3)(B). The threat of dismissal would have little credibility if that debtor could simply convert his case to a Chapter 13 case and then confirm a plan that required nothing more of him than that required by Section 1325(b). There is no question that Congress, in enacting BAPCPA, wanted Chapter 7 debtors who risk Section 707(b)(1) dismissal because of their financial wherewithal to still benefit from the bankruptcy laws through the proposal and execution of a Chapter 13 plan that accounts for that wherewithal. Otherwise, Congress would not have given conversion to Chapter 13 as an option to dismissal. 11 U.S.C. § 707(b)(1). However, that purpose cannot be fulfilled if debtors who are so situated are permitted the very same safe harbor under Section 1325(b) that is denied them in Chapter 7 by Section 707(b)(3)(B). Ability to pay must be part of Section 1325(a)(3) good faith if that section is to properly complement Section 1325(b).

Provisions within Chapter 13 itself also lend support to the inclusion of ability to pay as a good faith factor under Section 1325(a)(3). Those who advocate a temporal interpretation of the applicable commitment period under Section 1325(b) have also argued that there is no reason to include ability to pay within Section 1325(a)(3) good faith because Section 1325(b) already requires the debtor to commit all of his disposable income for either the three or five year commitment period. However, disposable income is not a static concept. Granted, one can certainly project what a debtor will accumulate as his disposable income over the applicable commitment period based upon whatever set of assumptions is selected at the time the plan is to be confirmed.

What if, though, the debtor later changes his mind? For example, may a debtor a year or two after confirmation reduce his planned distribution to unsecured creditors in order to purchase on credit a bass boat? Section 1329(a)(1) certainly would allow for such a plan modification, subject, of course, to approval by the court under Section 1329(b). However, Section 1329(b) includes no equivalent to Section 1325(b) should the Chapter 13 trustee complain that the debtor's plan, if modified, would no longer be reflective of his best efforts. All that is required under Section 1329(b) for approval is that the proposed modification meet the requirements of Section 1325(a).[31]

One would certainly assume that Section 1325(a)(3) good faith would still stand in the way of any such effort. In other words, a debtor should not be able to manipulate his plan post-confirmation to later divert earnings from his creditors to the purchase of a toy without also violating his ongoing duty to deal honestly with those creditors. However, if ability to pay

**31.** Section 1329(b) states that Sections 1322(a) and (b) and Section 1323(c) apply as well. However, compliance with Sections 1322(a) and (b) is subsumed within the confirmation standard of Section 1325(a)(1) and Section 1323(c) simply affords a secured creditor the opportunity to impose the confirmation standards of Section 1325(a)(5) if it so elects.

considerations like this are to be included in the good faith standard whenever such post-confirmation abuses are attempted, then courts like *Barr* and *Farrar–Johnson* must explain why similar considerations are not relevant to applying the very same good faith standard to such abusive plans when confirmation is originally sought.

On the other hand, treating the Section 1325(b) objection at confirmation as simply an objective "snapshot" to complement the subjective good faith standard of Section 1325(a)(3) requires no such explanation, for the snapshot approach regards Section 1325(b) not as a safe harbor, but rather as certain hazard. In other words, Section 1325(b) guarantees that a debtor's plan will not be confirmed if the Chapter 13 trustee or another eligible creditor objects and if the distribution proposed for unsecured creditors under his plan is not at least equal to the amount required by the Section 1325(b) formula. However, there is not the reciprocal guaranty that the debtor's plan will be confirmed if the debtor avoids the Section 1325(b) hazard, for he still must satisfy the court on a subjective basis that his plan is proposed in good faith as required by Section 1325(a)(3), or, as the Sixth Circuit has put it:

> [his] plan, given his or her individual circumstances, satisfies the purposes undergirding Chapter 13: a sincerely-intended repayment of pre-petition debt

consistent with the debtor's available resources.

*Okoreeh–Baah,* 836 F.2d at 1033.

Moreover, while the debtor may no longer be subject to the objective Section 1325(b) snapshot in the event he later proposes a plan amendment to reduce the distribution to unsecured creditors as originally confirmed, the debtor is not released of the same subjective good faith standard that governed the original confirmation. He remains obligated under Section 1325(a)(3) to satisfy the court that his plan, as modified, still reflects an honest effort to repay his unsecured creditors under the circumstances.[32]

BAPCPA's addition of a second good faith requirement to the Section 1325(a) confirmation standards is also significant. Section 1325(a) now reads as follows:

> [T]he court shall confirm a plan if—
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (3) the plan has been proposed in good faith . . ., [and]
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (7) the action of the debtor in filing the petition was in good faith;

11 U.S.C. §§ 1325(a)(3) and (a)(7).

*Caldwell I,* in affirming ability to pay as a central component of Section 1325(a)(3)

---

**32.** The Chapter 13 trustees in this district have continued the pre-BAPCPA practice of requiring debtors to include within their plans an agreement to commit to the performance of their plans all of their projected disposable income over whatever is the required period. Section 1325(b)(1)(B) has always been the justification for this requirement. However, the changes made by BAPCPA to Section 1325(b) raise the question as to whether a debtor can be any longer compelled to include such language. In other words, if, as I have concluded, Section 1325(b) as now enacted represents only a snapshot in time of the debtor's projected performance for purposes of comparison, it cannot also be relied upon as a basis to force the debtor to add plan language guarantying that he will in fact pay into the plan what the rates ultimately allow him as his future due. Of course, the debtor and the Chapter 13 trustee can still agree to the inclusion of such a provision as part of a negotiated settlement. However, absent such an agreement, the Chapter 13 trustee is left to simply objecting to the debtor's plan under either the objective standard now set out in Section 1325(b) or the subjective standard of good faith that continues under Section 1325(a)(3).

good faith, cited with approval the eleven factors first set out by the Eighth Circuit in *Estus*. However, as already discussed, the Eighth Circuit itself had concluded in *Zellner* that most of the *Estus* factors had been "subsumed" by the 1984 addition of the "best efforts" test because those factors related to ability to pay.

EAC further argues that the plan was not proposed in good faith as required by 11 U.S.C. § 1325(a)(3) (1982). This court has not given a comprehensive definition to "good faith" as used in Chapter 13. *See In re Terry*, 630 F.2d 634 (8th Cir.1980). In *Estus, supra*, however, the court listed a number of factors it considered relevant to the good faith analysis. The Code has since been amended to include 11 U.S.C. § 1325(b). This section's "ability to pay" criteria subsumes most of the *Estus* factors and allows the court to confirm a plan in which the debtor uses all of his disposable income for three years to make payments to his creditors. Thus, our inquiry into whether the plan "constitutes an abuse of the provisions, purpose or spirit of Chapter 13," *Estus*, 695 F.2d at 316, has a more narrow focus. The bankruptcy court must look at factors such as whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code.

*Zellner*, 827 F.2d at 1226–27 (footnote omitted).

*Zellner's* rationale, though, for eliminating the *Estus* ability to pay factors from Section 1325(a)(3) good faith is much less persuasive with the addition of Section 1325(a)(7), for that addition itself subsumes the criteria *Zellner* recognized as remaining to the extent that that criteria relates to the debtor's actions in filing his petition. Granted, one could simply extend *Zellner's* logic to conclude that the addition of Section 1325(a)(7) is designed to narrow Section 1325(a)(3) good faith even further. However, such reasoning seems inconsistent with BAPCPA's stated purpose to curb bankruptcy abuse. The addition of Section 1325(a)(7) suggests instead a recognition by Congress of the objective/subjective dichotomy that the Sixth Circuit had fashioned in *Okoreeh–Baah* and *Caldwell I and II* during the interval between the 1984 amendments and BAPCPA. Put differently, the addition of Section 1327(a)(7) as a separate basis for denying confirmation to improperly motivated debtors makes even more compelling the argument that a debtor's financial wherewithal is to be the focus of Section 1325(a)(3) good faith and that Section 1325(a)(3) is to serve as the subjective counterpart to Section 1325(b)'s objective effort to assess that wherewithal.

■ This, of course, is not to say that the debtor's ability to pay is the only factor the court is to consider for purposes of Section 1325(a)(3) or that it is to predominate in every instance. As with Section 707(b)(3)(B), the difference between what the debtor can afford to pay his creditors, when compared to what he is actually proposing to pay his creditors, may be so great that that difference, in and of itself, may be sufficient to warrant rejection of the plan. However, there may be mitigating circumstances that would justify the difference. Or other aspects of the debtor's plan might be enough to constitute abuse even though the debtor's wherewithal is quite modest. The point is that a court's evaluation of a plan's, if you will, "good faith," is to be fact-intensive. It is to be subjective. It is to turn upon consideration of the totality of the debtor's circumstances as they relate to the plan pro-

posed just as the court's evaluation of a Section 707(b) dismissal under Section 707(b)(3)(B) is to turn on consideration of the totality of the debtor's financial condition.

As Judge Kaplan observed in *LaSota*, good faith is a tool used by courts to hew "rough justice." *LaSota*, 351 B.R. at 61. However, it is not for the judiciary to impose its own set of values upon debtors, especially when Congress itself has not legislated a moral standard. Milton Freedman, the great Nobel laureate, based his economic philosophy upon the firm belief that it is the individual, not his government, who knows how best to satisfy his needs. There is no reason why courts should not have this same faith when they deal with debtors. Too many judges have fretted over whether a debtor's budget should include an allowance for cigarettes or whether the debtor is driving too expensive of a car. Far more important is consideration of what is to be the fair division of a debtor's future income between his creditors and himself.

■ I find nothing within either the Bankruptcy Code as now enacted or in the controlling case law interpreting either the current or previous expressions of the bankruptcy laws that rejects this belief. Therefore, I conclude that proposing a plan in good faith today under Section 1325(a)(3) means the same as what it meant under Section 1325(a)(3) pre-BAPCPA, that the debtor is to make a honest effort to repay his creditors, for the underlying purpose of a Chapter 13 plan has always been "the sincerely-intended repayment of pre-petition debt consistent with the debtor's available resources." *Okoreeh–Baah*, 836 F.2d at 1033; *Caldwell I*, 851 F.2d at 858–9. Moreover, I conclude that Section 1325(b) affords no relief to debtors from this responsibility. Section 1325(b) is a hazard, not a harbor. Its avoidance does not mean clear sailing. Rather, all debtors still must establish that their plans exhibit the good faith demanded by Section 1325(a)(3).[33]

■ Finally, consistent with *Okoreeh–Baah*, I reaffirm that Section 1325(a)(3) good faith is best measured by comparing what the debtor is proposing under his plan with what a similarly situated person

---

**33.** It is well to remember that while consideration of a debtor's plan under Section 1325(b) requires an objection, consideration of the debtor's plan under Section 1325(a) does not. Rather, Section 1325(a) states only that "... the court shall confirm a plan if—...". The obverse, of course, is that the court is not to confirm a plan whenever one of the Section 1325(a) standards has not been met. *See also*, FED.R.BANKR.P. 3015(f) ("If no objection is timely filed, the court may determine that the plan has been proposed in good faith and not by any means forbidden by law without receiving evidence on such issues.").

The custom in this district is for the Chapter 13 trustee to appear at the confirmation hearing and either recommend the proposed plan for confirmation or oppose its confirmation. If the Chapter 13 trustee recommends a Chapter 13 plan for confirmation, the Chapter 13 trustee is affirmatively representing that the plan, in her opinion, conforms with the confirmation standards of Section 1325 and that, to the best of her knowledge, she is not aware of any objection to the confirmation of that plan. The Chapter 13 trustee also establishes with her recommendation that the plan to be confirmed is the plan as amended as of the day of confirmation to the extent any amendment has been made to that plan.

However, the Chapter 13 trustee's recommendation is only evidentiary. It is the debtor's duty to file a Chapter 13 plan, 11 U.S.C. § 1321, and the burden lies with the debtor to establish that the plan presented for confirmation meets the confirmation standards of Section 1325. *In re Nosker*, 267 B.R. 555, 559 (Bankr.S.D.Ohio 2001). Consequently, the Chapter 13 trustee's recommendation to confirm a plan is in effect nothing more than an offer of proof on behalf of the debtor that the debtor in turn can use in at least an uncontested setting to meet the evidentiary burden imposed upon him.

in the debtor's community could afford to pay yet still live a modest but comfortable lifestyle. Nothing within this standard requires the debtor to spend his earnings in a particular fashion. He is free to spend what is his as he sees fit. All that Section 1325(a)(3) requires is that the debtor justify that what he has proposed to keep for himself vis-à-vis what he proposes to pay his creditors under his plan is a fair allocation under the circumstances.[34]

Granted, terms like "fair allocation" and the like may raise concerns of pre-BAPCPA recidivism. However, like Section 707(b)(2), Section 1325(b) as now amended only ensures that certain abusers of the Chapter 13 process will be caught. BAPCPA was never intended to relieve the court of its duty under Section 1325(a)(3) to administer "rough justice" among the rest based upon the circumstances of each case. It is already quite evident that a significant number of relatively well off debtors will be able to avoid compliance under Section 1325(b) because of differences between their average historical earnings and their current earnings. Debtors so situated certainly do not like the fact that Section 1325(a)(3) good faith still requires them to account for their present wherewithal in order to confirm their plan. However, the good news for debtors is that courts do have the latitude under Section 1325(a)(3) to accommodate a debtor's needs or even his eccen-

tricities. Prescription drugs might justify a larger than ordinary budget. The Mercedes or Lexus may still be kept in exchange for a less expensive apartment. Indeed, I see no reason why a debtor could not choose a lifestyle more frugal than the one dictated by a "good faith" budget and pocket those savings without running afoul of Section 1325(a)(3).

■ There remains, though, the lingering question of what plan length should be used in applying the Section 1325(a)(3) good faith standard I have adopted. In other words, over what period of time should the court compare what the debtor is proposing under his plan with what a similarly situated debtor can afford? More to the point, should the comparison for an above-median-income debtor be based upon five years? I conclude that all debtors' plans should be evaluated for good faith under Section 1325(a)(3) based upon the assumption that three years is the appropriate measure. Three years still appears to be the expected length for most plans proposed under Chapter 13 notwithstanding the enactment of BAPCPA. Although five years may be the applicable commitment period for purposes of evaluating a Section 1325(b) objection to an above-median-income debtor's plan, nothing within the Code mandates that the same period is to apply in the event that that objection is not sustained. Moreover, the plan length chosen, whatever that may

---

**34.** The question does arise as to whether income that is specifically excluded from the definition of "current monthly income" under Section 101(10A) (*e.g.*, social security benefits) may be considered for assessing Section 1325(a)(3) good faith. I believe that the debtor's receipt of such income is relevant. However, it would represent only a single element of what could be a large set of circumstances that must be considered for purposes of that section.

A more difficult question arises with respect to payments by the debtor on account of a so-

called 401(k) loan, for Section 1322(f) provides that such payments "shall not constitute 'disposable income' under Section 1325." Whether "disposable income" means only disposable income as used under Section 1325(b) or whether it also means that 401(k) loan repayments are also not to be considered when evaluating Section 1325(a)(3) good faith is unclear. Suffice it to say that at least this issue need not be addressed as part of my opinion.

be, serves no purpose other than to assist in establishing a starting point to conduct the fact-intensive inquiry contemplated under Section 1325(a)(3). For example, a particular debtor's plan length could be only two years if the debtor's circumstances established that the third year of the debtor's disposable income was needed as supplemental savings for an impending retirement. On the other hand, a debtor might want to keep his expensive home or car without also having to make the necessary adjustments to other aspects of his lifestyle so as to still fairly allocate his income between his unsecured creditors and him over three years. Consequently, the debtor himself might elect a four or even five year plan as a solution. 11 U.S.C. § 1322(d).

### *CONCLUSION*

BAPCPA has created a new world for the courts and practitioners alike. Substantial changes have been made as to how both Chapter 7 and Chapter 13 consumer bankruptcies are to be administered. These changes, though, have not been made in a vacuum. Rather, they have been incorporated into a legislative framework that has been shaped and refined by both judicial interpretation and local custom for more than 25 years. The number of decisions and articles written on Section 1325(b) alone since BAPCPA became effective well illustrates the challenge of integrating into this framework the significant changes that it involves. I suspect that this process will last for years as issues like the ones presented in the instant case wind their way up to the circuit courts and perhaps even to the Supreme Court. It is anyone's guess as to what will be the outcome. Nonetheless, the lower courts must forge ahead as best they can to fairly administer the Bankruptcy Code as now enacted while at the same time maintaining the hope that, in time, their collective efforts will provide some insight to the appellate courts as to what should be the final interpretation.

With this in mind, then, I make the following determinations with regards to the Section 1325(b) and Section 1325(a)(3) objections that the Chapter 13 Trustee has made. First, I conclude that Section 1325(b), as amended, establishes a set formula against which the debtor's proposed plan payments to unsecured creditors must be measured if either the Chapter 13 trustee or an eligible creditor objects. Omitted from this formula is any consideration of a debtor's Schedule I earnings. For better or worse, it is the debtor's average historical income or, as the Bankruptcy Code describes it, the debtor's "current monthly income," that is now used to establish the income component of this calculation. As for the expense component, that determination is the same as it was pre-BAPCPA for debtors whose incomes are not above the applicable standard set by Section 1325(b)(3). That is, the expense component of the Section 1325(b) calculation in those instances is still based upon a determination by the courts of what a debtor reasonably needs to expend for his and his dependents' maintenance and support. However, what an above-median-income debtor can use as the expense component for the Section 1325(b) calculation may be subject to further reduction if the allowances and other limits imposed by Sections 707(b)(2)(A) and (B) so require.

Second, I conclude that Section 1325(b) as now amended does not include a "temporal" aspect and that Section 1325(b) in fact did not have such an element even before BAPCPA was enacted. Rather, Section 1325(b) continues to require only a mathematical calculation and, as such, the time period used for that calculation is simply another factor in the equation.

BAPCPA's only effect here has been to change that factor from a constant to a variable. Prior to BAPCPA, 36 months was used in all Section 1325(b) calculations. However, 60 months is now used instead of 36 months if the debtor's income exceeds the Section 1325(b)(3) standard.

Finally, I conclude that a debtor's ability to fund a Chapter 13 plan based upon his current earnings and expenses remains an important consideration for purposes of determining whether the debtor's plan is proposed in good faith under Section 1325(a)(3) even in those instances when the debtor has successfully withstood an objection brought under Section 1325(b). Section 1325(b) does nothing more than set an objective benchmark for determining when confirmation is to be denied. Passing the Section 1325(b) test, though, does not mean that the debtor's financial wherewithal is exempt from further scrutiny by the court. Rather, the good faith standard of Section 1325(a)(3) still requires the debtor to establish to the court's satisfaction that he is in fact making an honest effort under the circumstances to repay his creditors through his proposed plan.

As for the specifics of Debtors' plan in this instance, Debtors propose, over the Chapter 13 Trustee's Section 1325(b) objection, a total distribution to all unsecured creditors of $8,430. Again, Debtors arrive at this amount by subtracting expenses as calculated in their Form B22C ($10,255.00) from the current monthly income as also calculated in their Form B22C ($10,115.00) and then multiplying the remainder ($140) by the applicable commitment period of 60 months. Debtors' formulation of the required calculation is correct and Debtors' determination of the income component to this formula is also correct. However, Debtors have grossly overstated the expense component of the equation by including within its calculations expenditures for a Florida timeshare and a second home mortgage that Debtors in fact do not intend to pay if their plan is confirmed. While it may be appropriate to include these expenditures in connection with whether Debtors could pass the means test were Debtors instead seeking relief under Chapter 7, Debtors are seeking relief under Chapter 13 and the additional requirements imposed by Section 1325(b) regarding the calculation of the expense component of the statutory equation precludes the inclusion of any expenditure that Debtors in fact do not actually need for the post-confirmation support and maintenance of their family under the plan they are proposing.

Therefore, Debtors' current plan cannot be confirmed for this reason alone. However, I will not deny Debtors another opportunity to prepare a plan that will adequately address any Section 1325(b) objection. Therefore, a confirmation hearing will be rescheduled notwithstanding my prior order prohibiting further adjournments. In the interim, Debtors may file and properly notice whatever amended plan they wish to propose to overcome not only any objection the Chapter 13 Trustee might continue to have under Section 1325(b) best efforts or Section 1325(a)(3) good faith but also any additional objection another party in interest might have under Section 1325. I will then evaluate whatever plan has been proposed.

It is distinctly possible that the amended plan could be confirmed at the adjourned hearing, especially if the Chapter 13 Trustee has replaced her objections with a recommendation for confirmation. Indeed, the Chapter 13 Trustee and Debtors may negotiate a resolution whereby the dividend to be paid unsecured creditors falls short of what is required by Section 1325(b). After all, it is within the Chapter

13 Trustee's prerogative to withdraw her objections provided that that decision otherwise comports with her fiduciary duties to the estate. However, if an agreement cannot be reached, then an evidentiary hearing may be required.

It is also possible that no evidentiary hearing will be necessary because Debtors simply cannot now propose a plan that can be confirmed over the Chapter 13 Trustee's continuing objections. If so, then it is likely that whatever plan Debtors have on file at the time of the adjournment will be rejected as unconfirmable and that Debtors' Chapter 13 proceeding will be dismissed without further hearing.

The court will prepare an order consistent with this opinion.